**CONOPCO, INC.,** d/b/a **Calvin Klein Cosmetics Company** and **Calvin Klein Cosmetic Corporation, Plaintiffs,**

v.

**COSMAIR, INC., Polo Ralph Lauren Corp., and PRL USA Holdings, Inc., Defendants.**

**No. 98 Civ. 4337(JES).**

United States District Court, S.D. New York.

May 7, 1999.

Cowan, Liebowitz & Latman, New York City, Joshua Paul, Arthur J. Greenbaum,

Joseph H. Lessem, Robert W. Clarida, of counsel, for plaintiffs,

Darby & Darby, P.C., New York City, Ethan Horwitz, Andrew Baum, Ira Jay Levy, Kandis M. Kahn, of counsel, for defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

In this action for trademark infringement, trade dress infringement, unfair competition and dilution, plaintiffs Conopco, Inc., d/b/a Calvin Klein Cosmetics Company, and Calvin Klein Cosmetic Corporation (collectively "Conopco") seek a preliminary injunction against Cosmair, Inc., Polo Ralph Lauren Corporation, and PRL USA Holdings, Inc., (collectively "Cosmair"), from selling or advertising one of Cosmair's new products that Conopco claims, *inter alia,* infringes on its trademark and trade dress rights. For the reasons set forth below, the Court denies Conopco's motion for a preliminary injunction and Cosmair's cross-motion for attorney's fees.

## BACKGROUND

Conopco is the licensee of Calvin Klein Industries responsible for manufacturing and marketing various cosmetics that bear the name "Calvin Klein." *See* Transcript of Hearing held on July 20–23, 29, August 17–19, September 17, 1998, ("Tr.") at 62–63. ETERNITY is one of ten brands of Calvin Klein Cosmetics handled by Conopco. *See id.* at 66. The ETERNITY line of products is sold in approximately 2,000 retail stores here in the United States and throughout the world. *See id.* at 83–84. The line includes an eau de parfum,[1] a higher quality perfume product, and ancillary products such as soap and scented candles. *See id.* at 77–79.

Prices for the fragrance products range from $30 for a smaller-size, low-grade fragrance up to $180 for the one-ounce high quality perfume. *See id.* at 71, 78–79. The bottle and trade dress of the "premium," high-end ETERNITY perfume is the product at the heart of the instant litigation. Since 1988, ETERNITY sales in the United States of the higher quality perfume product have averaged about $500,-000 a year—just less than two percent of the total ETERNITY fragrance business. *See id.* at 104, 178–79; Defendants' Exhibit ("DX") AQ–17; Plaintiffs' Exhibit ("PX") 12. The ETERNITY perfume bottle is described by Conopco as their "icon bottle;" it is supposed to be the image the consumers picture when they think of ETERNITY. *See id.* at 114–15, 793–94.

The high quality ETERNITY perfume is sold in a bottle that is a registered trademark[2] owned by Conopco and held by plaintiff Calvin Klein Cosmetic Corporation. *See id.* at 65, 78. It is "elegantly dimensioned" and made of "high clarity flint glass." *See* PX–1. It has "bevelled edges, and heavy walled distribution ." *Id.* The design "gives the illusion of a bottle within a bottle, with softly contoured sides, and the fragrance free floating in the inner bottle cavity." *Id.* The bottle's cap is a squared-off silver-colored stopper. *See* Tr. at 119–20.

On June 19, 1998, Conopco filed a complaint seeking injunctive relief to "prevent [Cosmair] from infringing—and eventually destroying" their "valuable, federally-registered trademark"—their "icon bottle." [3] *See* Plaintiffs' Complaint ("Compl.") at 1. This followed a May 1st article in the trade

---

1. "Eau de parfum" refers to a fragrance product that has in it a mixture of alcohol and perfume. *See* Tr. at 78.

2. U.S. TM Reg. No. 1,608,754.

3. Cosmair argues that Conopco's six-week delay in filing the complaint after learning of the impending ROMANCE launch constitutes laches, and as such, the Court should decline to issue an injunction. Since the Court concludes that Conopco has failed to establish a likelihood of confusion, the Court does not consider this defense.

publication *Women's Wear Daily* that led Conopco to believe that the defendant, Cosmair, a licensee of Ralph Lauren, *see* Tr. at 545, planned to launch a line of fragrance products that would directly compete with its ETERNITY products. *See id.* at 90–93. This new line of products would be sold under the name RO-MANCE.[4] Cosmair hoped to have advertisements in September magazines and launch the new product on August 15th.[5] *See id.* at 577, 586.

Like ETERNITY, ROMANCE is a "prestige fragrance." *Id.* at 535. As such, it is sold in specialty stores or department stores and commands a fairly high price. *See id.* Cosmair also includes a photograph of the ROMANCE bottle, currently its highest quality perfume, in all advertising and related marketing displays for the entire ROMANCE line of products. *See id.* at 587–88. Cosmair planned to use this bottle to advertise the ROMANCE line and hoped the bottle would become its "icon bottle" over time. *See id.* at 588–89. It is this bottle which Conopco believes infringes on its trademark.

Focus group participants called the RO-MANCE bottle "[p]ure, simple, modern," and "elegant." *Id.* at 562. Technically speaking, however, the container is a squat, rectangular, glass bottle with straight edges. *See id.* at 252–53, 550–51. It has a silver cap that is flat and square, unlike the curved "T"-shape cap of the ETERNITY perfume bottle. *See* DX-AD7. The name "RALPH LAUREN RO-MANCE" appears on the collar of the cap.[6] *See* Tr. at 576–78, 781. Although the walls are slightly curved, they are "as thin and straight as technically possible." *See id.* at 550, 705–706.

Conopco claims that Cosmair's use of the ROMANCE perfume bottle and the trade dress chosen for the ROMANCE line are likely to cause confusion among consumers regarding the identity, origin, association or affiliation of each product. Accordingly, Conopco alleges that it is continuously and irreparably harmed so long as Cosmair is allowed to continue to use the ROMANCE perfume bottle,[7] in violation of the Lanham Act, New York's anti-dilution statute, and the New York common law of unfair competition.

## DISCUSSION

A party seeking a preliminary injunction must establish: "1) that it is subject to irreparable harm; and 2) either a) that it will likely succeed on the merits or b) that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships tips 'decidedly' in favor of the moving party." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997) (citing *Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996)). Moreover, the moving party must show that the likelihood of irreparable injury is more than a mere "possibility." Rather, the

---

**4.** The original name under which the fragrance line was to be sold was SILVER. However, Ralph Lauren rejected this name and chose the name ROMANCE which "generated the whole concept for the fragrance." *See* Tr. at 581

**5.** Monthly magazines frequently reached the news stands during the month prior to the date which appears on its cover. Therefore, an advertisement in a September magazine would reach consumers before ROMANCE's August 15th launch date. *See* Tr. at 767–68.

**6.** The initial design of the ROMANCE bottle did not contain the RALPH LAUREN RO-MANCE trademark on its collar. The trademark was added prior to the evidentiary hearing held in the instant litigation, but after Conopco filed its complaint.

**7.** Conopco moves for a preliminary injunction against both the pre-launch ROMANCE bottle that does not contain the RALPH LAUREN ROMANCE trademark on the collar, and against the later design that does. The Court will consider the motion against the two bottles simultaneously, and note any difference in the Court's analysis with respect to the two bottles, if any, where appropriate.

moving party must demonstrate that it is likely to suffer irreparable harm if equitable relief is denied. *See Fun–Damental Too, Ltd., v. Gemmy Industries Corp.*, 111 F.3d 993, 999 (2d Cir.1997). Where a plaintiff in an action for trademark or trade dress infringement seeks injunctive relief "the requirement of irreparable harm carries no independent weight," and "a showing of likelihood of confusion establishes irreparable harm." *Genesee Brewing*, 124 F.3d at 142 (citing *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988)). Finally, the issuance of a preliminary injunction is an extraordinary remedy that should not be granted unless the moving party has made a clear showing of entitlement to such relief. *See Jayaraj v. Scappini*, 66 F.3d 36, 38–39 (2d Cir.1995). With this in mind, the Court turns to address Conopco's trademark and trade dress claims.

## I. LANHAM ACT CLAIMS

Plaintiff Conopco has brought causes of action under the Lanham Act for trademark and trade dress infringement, 15 U.S.C. § 1114,[8] and false designation of origin, 15 U.S.C. § 1125(a).[9] To recover for trademark or trade dress infringement under Section 43(a), a plaintiff must prove two elements: "(1) that its trademark or dress is protectable because (a) it is inherently distinctive or (b) it has acquired distinctiveness by achieving 'secondary meaning' in the marketplace; and (2) that there is a likelihood of confusion between its

product and the defendant's product." *Samara Bros., Inc. v. Wal–Mart Stores, Inc.*, 165 F.3d 120, 124 (2d Cir.1998) (citing *Fun–Damental . Too*, 111 F.3d at 999). However, the distinctiveness inquiry is truncated when a validly registered federal trademark becomes "incontestable" after five years of continuous use subsequent to its registration. *See Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1076–77 (2d Cir.1993). The Second Circuit has made it "clear that a decision by the USPTO to register a mark without proof of secondary meaning 'affords a rebuttable presumption that the mark is more than merely descriptive.'" *Arrow Fastener Co. Inc. v. The Stanley Works*, 59 F.3d 384, 393 n. 6 (2d Cir.1995) (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1132 (2d Cir.1979)). In the instant action Cosmair concedes that Conopco's registration of the ETERNITY bottle's trade dress is valid. *See* Tr. at 1177. Thus, the only question left for the Court to consider in deciding the issue of infringement is whether Cosmair's product is likely to cause confusion. *See The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996); *Arrow Fastener*, 59. F.3d at 391.

Courts in this Circuit, in considering whether a junior user's mark is likely to cause confusion, weigh the eight factors outlined by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.). *cert. denied*, 368

---

**8.** Section 32(1) of the Lanham Act provides in pertinent part that: "Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114(1).

**9.** Section 43(a) of the Lanham Act provides in pertinent part that: "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a).

U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The "Polaroid" factors include: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendants' product; and (8) the sophistication of the buyers. *See id.* The above-referenced factors are not an exclusive list, nor is any single factor determinative, rather "the proper approach is to weigh each factor in the context of the others to determine ... if, on balance, a likelihood of confusion exists." *W.W.W. Pharmaceutical Co., Inc. v. The Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993). An examination of the above-factors leads the Court to conclude that Conopco has failed to establish a likelihood that consumers will be confused into believing that the ROMANCE bottle is somehow sponsored by and/or associated with ETERNITY.

*Strength of the Mark*

The "strength of the mark" analysis refers to the mark's ability "to identify the goods sold under the mark as emanating from a particular, although anonymous source." *McGregor–Doniger*, 599 F.2d at 1131. This analysis turns on a variety of factors, including the classification of the trademark or dress on the Abercrombie continuum as either generic, descriptive, suggestive, or arbitrary, *see Arrow Fastener*, 59 F.3d at 391, the presence or absence of secondary meaning, *id.*, and the "overall effect of the packaging." *Fun–Damental Too*, 111 F.3d at 1003. Ultimately, however "the essence of the analysis is to determine the strength of the

[trademark] or trade dress in the commercial context." *Id.*

Conopco argues that its trade dress [10] is inherently distinctive because they hold an incontestable trademark in the bottle at issue and because of the "virtually unlimited choices" available to fragrance bottle designers. *See* Plaintiffs' Post–Hearing Memorandum in Further Support of Motion for Preliminary Injunction ("Pls.' Mem.") at 11. Conopco notes that fragrance bottles come in "myriad sizes, color combinations, and shapes" *see* PX–43A through PX–43TT, and that bottle caps also come in a variety of colors and shapes. *See id.* In response, Cosmair concedes the validity of Conopco's trademark, but contends that Conopco's trademark is entitled to a limited scope of protection because "it consists of a combination of design elements used frequently throughout the fragrance industry." Defendants' Post–Hearing Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defs.' Mem.") at 2–4.

The Court concludes that Conopco's trade dress for its ETERNITY perfume bottle is inherently distinctive because it is an incontestably registered trademark, and therefore is entitled to protection. This, however, does not end the inquiry because a finding of inherent distinctiveness "does not guarantee that the mark is a strong one." *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 744 (2nd Cir. 1998) (quoting *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572); *Lever Bros. v. American Bakeries Co.*, 693 F.2d 251, 256–57 (2nd Cir.1982) (holding that even an arbitrary trademark can be a weak indicator of the origin or source of a product). In the case at bar, the Court finds that the ETERNITY perfume bottle's trade dress is weak because, considered as a whole, it

---

**10.** Conopco defines the trade dress of its ETERNITY perfume bottle in a photograph used in advertising as "monumental," "beautifully done," and like a piece of "sculpture." Tr. at 793. "When depicted in advertising/promotion material as an icon bottle, the bottle: (i) consists of two elements—a heavy rectangular glass container with a bulky silver-colored cap; (ii) bears no visible label or writing on the glass container identifying a product mark or designer name; and (iii) features a silver-colored band or ring at the base of the bottle's silver cap." Pls.' Mem. at 8.

is quite similar to perfume bottles used by past and present fragrance designers, and is therefore not particularly distinct. *See* Tr. at 234–37; PX–42, 43L, 43O, 43U, 43X; DX–B2, D1, D3, D4. Moreover, Conopco's own fact witness, Sheila Cutner, testified that the ETERNITY bottle contains many elements that are common in the industry, including the hourglass bottle, *see* Tr. at 253–59, the beveled edges, *see id.* at 253, 282–83, the absence of a designer name or product label, *see id.* at 248–52, 551–52, and a bottle top that contains a collar or ring. *See id.* at 259. In addition to being weak because it is similar to other trade dresses in the marketplace, the ETERNI-TY perfume bottle's trade dress is weak for another reason: Conopco has failed to prove that its trade dress possesses secondary meaning.

■■■ To establish the existence of secondary meaning, a plaintiff must show that "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir.1992). In making this assessment, certain factors guide the Court. They include, but are not limited to, "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir.1987). At issue here is whether and to what extent the Court should credit the advertising expenditures and the sales success of the entire ETERNITY product line to the perfume bottle at the center of this suit, and what weight, if any, Conopco's secondary meaning survey is due.

At the outset, the Court notes that the ETERNITY product line, considered as a whole, has been an extremely successful and profitable enterprise, and a leader in the fragrance industry. *See* Tr. at 99–100. For example, the entire ETERNITY product line has sold $342 million since 1988, and has consistently ranked in the top 10 women's fragrances. *See id.* Moreover, Conopco spends millions of dollars every year in advertising the ETERNITY line. *See* Declaration of Sheila Cutner ("Cutner Decl.") at ¶ 42. But, upon closer inspection, only a small portion of the total sales of the ETERNITY product line are attributable to the sales of premium ETERNI-TY perfume sold in the bottle at issue here.[11] *See* Tr. at 104, 178–179; DX–AQ17; PX–12. In fact, receipts for the premium ETERNITY perfume accounts for less than two percent, some $500,000 per year, of ETERNITY's total sales. *See* Tr. at 104, 178–79; PX–12. In addition, while Conopco's fact witness, Sheila Cutner, submitted a declaration to the Court stating that a photograph of the ETERNI-TY perfume bottle "appeared in virtually every ETERNITY ad placed in a U.S. magazine since 1988," Cutner Decl. at ¶ 45, the evidence at the hearing did not bear this out. At the hearing, Ms. Cutner testified that she did not know what percentage of magazine ads contained the ETER-NITY perfume bottle or what percentage of television or black and white ads contained the perfume bottle. *See* Tr. at 132, 187–188, 213. Finally, Ms. Cutner conceded that the perfume bottle was not used in *any* magazine advertising from 1990 through 1994. *See id.* at 132. Based on this evidence, the Court is not convinced that the ETERNITY perfume bottle itself has strong secondary meaning with the consuming public.

To further strengthen their position that their product has strong secondary mean-

---

11. Conopco concedes that the ETERNITY perfume bottle represents a small fraction of its entire yearly sales. Pls.' Mem. at 2. However, they argue that as the ETERNITY perfume bottle represents the entire ETERNITY line, the Court should attribute all ETERNITY sales and advertising expenditures to the perfume bottle in assessing its secondary meaning.

ing with consumers, Conopco conducted a survey that tested whether the participants could correctly ·identify the ETERNITY perfume bottle. *See id.* at 294–318. Twenty-one percent of the participants tested were able to correctly identify the bottle as coming from Calvin Klein or as the ETERNITY perfume bottle itself. *See id.* at 320. However, this survey suffers from numerous flaws, including an improper universe, improper control, and other defects designed to enhance recognition. Specifically, the survey suffered from three major defects: first, the survey universe was skewed because it excluded all female purchasers over the age of 45, *see* Tr. at 368–82, all male purchasers, *id.,* and it failed to distinguish between past or future purchasers, *id.;* second, the control bottle used in the survey did ·not faintly resemble the ETERNITY bottle; *see id.* at 429–40; PX–28, and finally, the survey was purposefully limited to malls where ETERNITY has a high recognition rate. *See id.* at 394–99. While a 21 percent recognition rate might normally be sufficient to establish secondary meaning, given the flaws in this survey, the Court is not convinced.[12] Accordingly, while there is some evidence of unsolicited media attention in the record to support a finding of secondary meaning, given the low sales figures, the uncertainty of the advertising evidence (including the fact that the bottle was not used in any magazine advertising for four consecutive years), and the weak survey results, the Court concludes that Conopco has failed to establish strong secondary meaning.

Since the ETERNITY perfume bottle's trade dress is quite similar to other perfume producers, is not particularly distinctive in the fragrance industry, and in the absence of persuasive evidence establishing secondary meaning, the Court concludes that· Conopco's trade dress is entitled to a limited scope of protection.

*Similarity Between the Two Marks*

 In evaluating the degree of similarity between the two trade dresses, the Court must determine "the general impression conveyed to the purchasing public by the respective marks." *Centaur Communications,* 830 F.2d at 1226. This determination encompasses a review of the entire look of product or packaging, *see Bristol–Myers Squibb Co.,* 973 F.2d at 1045–46, including, the "products' sizes, logos, typefaces, and package designs." *W.W.W. Pharmaceutical Co.,* 984 F.2d at 573. Finally, "the presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in·question is highly relevant to an inquiry concerning the similarity of the two dresses. When prominently displayed it can go· far towards eliminating any possible confusion ...." *Bristol–Myers Squibb Co.,* 973 F.2d at 1046.

In the instant case, the Court finds that the dissimilarity between the ROMANCE and ETERNITY bottles, and the presence of the ROMANCE mark on the bottle top, box, and related advertising and point of sale displays militate against the conclusion that the parties' trade dresses are similar. The ETERNITY bottle is tall and thin, with a curved "T" shaped silver cap. *See* DX–AD7. The ROMANCE bottle is short and squat, and its silver-colored cap is flat and square. *See* DX–ACT. Also, the ETERNITY bottle has beveled edges, and a wall that gives the appearance of an "hourglass" or a "bottle within a bottle." *See* DX–AD7. The walls of Cosmair's bottle, although slightly curved, are not similar to Conopco's bottle, and are, apparently, as straight as technically possible.[13] *See* Tr. at 550–53, 705–06. Apart

---

12. Given Conopco's argument that the ETERNITY perfume bottle, the "icon bottle" represents the entire line, and therefore all sales and advertising expenditures should be attributed to it, the Court finds the low 21 percent identification rate in their flawed survey all the more telling.

13. On September 14, four days prior to final argument on the instant motion, counsel for

from the dissimilarity of the two bottles, the likelihood of consumer confusion is also minimized by the differing marketing techniques employed by the parties and the prominent inclusion of the ROMANCE name on the bottle cap and box.

ROMANCE is marketed in retail stores that display and sell the fragrance in its distinctive silver and pink box at display areas that echo the ROMANCE marketing motif. *See id.* at 566–71. The name ROMANCE is on the center of the bottle's packaging box and on other various point of sale displays. *See* Tr. 566–67, 571, 781–83; 913–16, 970–71; DX–ACT. Also, consumers may only purchase RO-MANCE through a salesperson at the ROMANCE display counter. *See* Tr. at 569–72. In contrast, Conopco markets its ETERNITY perfume in a white box with the trademark ETERNITY clearly displayed in prominent black letters. *See* PX–7. The ETERNITY mark is also conspicuously displayed on advertising and point-of-sale displays. *See* Tr. 141–48; PX–20A, 21, 22. ETERNITY perfume is also sold in an "open sell" environment that permits consumers to purchase the product without the assistance of an ETERNITY salesperson. Finally, the presence of the RALPH LAUREN RO-MANCE label, conspicuously exhibited on point of sale displays, on the ROMANCE box, and on the collar of the ROMANCE bottle top itself,[14] significantly reduces the possibility that consumers will erroneously conclude that ROMANCE is somehow sponsored by or associated with the ETERNITY product.[15] Thus, the Court concludes that this factor strongly favors Cosmair.

*Proximity of the Products*

This factor addresses whether and to what extent the parties compete with each other. *See W.W.W. Pharmaceutical Co.,* 984 F.2d at 573. In making this assessment "the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal." *Id.* (citing *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985)). Conopco argues that the parties directly compete with each other for identical consumers, *see* Tr. 87, 603, in similar stores, *id.* at 66–68, 84, at like prices, *id.* at 91–92, and in the same consumer magazines. *See* Pls.' Mem. at 16. Conopco further contends that Cosmair's new advertising campaign "augments" the likelihood that consumers will incorrectly conclude that ROMANCE is affiliated with or sponsored by Conopco. *See id.* at 16–17. While the Court agrees with Conopco that the goods are proximate

Conopco requested leave to reopen the record in light of new evidence. *See* Declaration of Joshua Paul. The new evidence consisted of three new photographs of the ROMANCE bottle, one that allegedly showed an enhanced "hourglass" effect, and two which showed the pre-launch bottle on post launch point-of-sale displays. The Court simply does not agree with Conopco's contention that the RO-MANCE bottle appears to have an enhanced "hourglass" look in the photo, nor that the evidence of the point-of-sale display with the pre-launch bottles contradicts Cosmair's explanation to the Court that some point of sale displays with the pre-launch bottle might appear during the initial launch. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Reopen the Hearing Record at Ex. A. While the Court will reopen the record to include the additional photos, they do not effect the Court's ultimate determination of Conopco's motion.

14. Conopco argues that they are entitled to a preliminary injunction against the pre-launch ROMANCE bottle that does not contain the RALPH LAUREN ROMANCE mark on its collar, even though Cosmair has not sold a single unit of this bottle. Notwithstanding the Court's determination that the inclusion of the RALPH LAUREN ROMANCE mark on the bottle lessens the similarity of the bottles, its absence does not change the Court's finding that the bottles are dissimilar.

15. Conopco contends that the inclusion of the RALPH LAUREN ROMANCE mark actually increases the likelihood that consumers will incorrectly conclude that ROMANCE is sponsored by or associated with ETERNITY. *See* Pls.' Mem. at 15. The cases cited by Conopco are clearly inapposite here, given the weakness of the ETERNITY perfume bottle's trade dress.

because they are directly competing products (although ·they are not sold at the same price), and ·finds that this factor weighs in Conopco's favor, the Court is not convinced that Cosmair's advertising campaign contributes to this conclusion.

Conopco posits that Cosmair's new advertising campaign, including black and white lay-outs coupled with images of sex, "represents a fundamental· departure" from the established Ralph Lauren look. *See id.* Since ETERNITY is known for both black and white advertising and sex, Conopco asserts that this is likely to cause consumers to assume that ROMANCE is sponsored by ETERNITY. *See id.* Cosmair counters that Conopco is simply focusing on one photograph in the entire marketing scheme, and that ETERNITY, by Conopco's own admission, is known for love, marriage and commitment, not necessarily sex. *See* Tr. at 1191. Moreover, Cosmair argues that Conopco cannot bar anyone from advertising in black and white [16] with themes of romance and sex. *Id.* The Court agrees with Cosmair and concludes that the ·advertising is not so proximate that consumers will incorrectly associate ETERNITY with ROMANCE, and further that any confusion that may result is minimized ·by the prominent inclusion of the RALPH LAUREN trademark on the advertising.[17] In sum, although the Court rejects Conopco's theory that Cosmair's advertising is likely to confuse consumers because it is highly proximate to its own, the Court does find that the products directly compete in the same market and for the same consumers. Therefore, this factor favors Conopco.

*Bridging the Gap*

In assessing this factor, the Court must consider the likelihood that the senior user will enter the junior user's market. *See*

*Arrow Fastener,* 59 F.3d at 396–97. Here, Cosmair concedes, as it must, that there is "very little gap to be bridged." *See* Tr. at 1171. Aside from the difference in price, the products currently compete for the same consumers and in the same market. *See id.* at 87, 603. Accordingly, in light of the Court's prior finding that the products are in direct competition in the same market, the Court concludes that this factor is irrelevant. *See Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 586 (2d Cir.1993).

*Actual Confusion*

■ Evidence of actual confusion is a strong indication that a likelihood of confusion exists. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259 (2d Cir.1987). However, it is well established that actual confusion need ·not be shown to prove a "likelihood of confusion" under the Lanham Act. *See e.g., Streetwise Maps. Inc.,* 159 F.3d at 745 (citing *Arrow Fastener,* 59 F.3d at 397). This is because actual confusion is so difficult to prove. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986) (citing *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 662 (2d Cir.1970)). Acknowledging this, courts have allowed, in addition to incidents of actual confusion among consumers, scientific surveys which test the statistical likelihood of consumer confusion to be submitted as evidence of actual confusion. *See e.g. Sterling Drug. Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir.1994); *Simon & Schuster, Inc. v. Dove Audio, Inc.,* 970 F.Supp. 279, 298–99 (S.D.N.Y. 1997); *Cumberland Packing Corp. v. Monsanto Co.,* 32 F.Supp.2d 561, 570–71 (E.D.N.Y.1999).

■ A survey is admissible into evidence if it tends "to make the existence of any fact that is of consequence to the

---

16. In fact, Cosmair correctly notes that Ralph Lauren has conducted black and white· advertising campaigns in the past, *see* Tr. at 787–93, 797–800, 972–73, and that black and white advertising is quite common in the fragrance industry. *See id.* at 225–30.

17. Each ROMANCE ad cited by Conopco as proximate to its own clearly states "RALPH LAUREN ROMANCE—INTRODUCING THE NEW WOMEN'S FRAGRANCE BY RALPH LAUREN." *See* PX 45–47.

action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. A survey is only inadmissible if its flaws destroy all of its relevance. *See McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988); *Arche, Inc. v. Azaleia, U.S.A., Inc.*, 882 F.Supp. 334, 336 (S.D.N.Y.1995) (where a survey's probative value is exceeded substantially by its prejudicial effect, a survey should be excluded). In the instant case, both sides have conducted market surveys that address the issue of consumer confusion. Though several of the surveys pointed to similar results, each side complained that the other's surveys were flawed. *See* Pls' Mem. at 21–23; Defs' Mem. at 11–16. In fact, Conopco, who bears the burden of proof in this case, characterized the survey evidence as a "mess" and asked the Court to minimize the weight given to the survey evidence. *See* Tr. at 1139. However, the probative value of each of the four confusion surveys has been considered and the weight given to each has been adjusted for any flaws that the Court has found. *See Simon & Schuster, Inc.*, 970 F.Supp. at 299.

In the first confusion study submitted by Conopco, women between the ages of 18 and 45 were shown the Defendant's pre-launch ROMANCE bottle and were then asked if they knew the "fragrance's brand name or producer." Pls' Mem. at 13. Approximately 24 percent of those surveyed identified the pre-launch ROMANCE bottle as ETERNITY or as a Calvin Klein product. *See* Tr. at 349, 353–54. Despite this result, the survey's probative value is quite limited given: (1) the survey's universe, (2) the survey's stimulus, and (3) the survey's presentation of the stimulus and control bottles.

 To be probative and meaningful, a survey must rely upon responses from all potential consumers of the product in question. *See Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir.1984) (citing *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F.Supp.

1108, 1116 (S.D.N.Y.1981) (" 'To be probative and meaningful ... surveys ... must rely upon responses by *potential* consumers of the products in question.' ") (emphasis added); *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 661 n. 4 (2d Cir.1979) (universe improper because although survey participants may have once purchased hiking boots, it does not follow that they were presently interested in purchasing hiking boots); *Cumberland Packing*, 32 F.Supp.2d at 572. (criticizing survey for not distinguishing "between past users who intend to purchase sugar-substitutes in the future and those who do not."). A flawed universe minimizes the probative value of a survey. *See Mobil Oil*, 818 F.2d at 259–60. The universe tested by Conopco's expert, Dr. Simonson was flawed and led to skewed results for several reasons: (1) it excluded all men and women over the age of forty-five who represent a substantial portion of the total universe of the products' potential consumers; *see* Tr. at 987; PX–9, (2) it included past purchasers who were not necessarily future potential purchasers; *see id.* at 1015–19, and (3) it failed to properly discriminate between purchasers of "prestige fragrance" brands as opposed to those who purchase just any fragrance. *See id.* The proper universe would include men as well as women who are potential purchasers of *prestige* fragrance brands. *See* Tr. at 429–40. The universe flaws diminish the evidentiary value assigned to the survey's final result.

To have substantial probative value, a survey, in addition to testing the proper universe, must also be designed to examine the impression presented to the consumer by the accused product. *See Bristol–Myers Squibb*, 973 F.2d at 1042. Therefore, a survey must use the proper stimulus, one that tests for confusion by replicating marketplace conditions. *See Cumberland Packing*, 32 F.Supp.2d at 575 (survey flawed because it "failed to resemble actual market conditions."). The ROMANCE bottle shown to the survey's re-

spondents was the "pre-launch bottle," not the one consumers would eventually see with a collar label that reads "RALPH LAUREN ROMANCE." *See* PX–29. Since the bottle shown to the participants was not the one they would encounter in the marketplace, the probative value of the survey must suffer accordingly.[18]

Similarly, Conopco's presentation of the various stimuli and controls,[19] including the accused bottle, failed to properly replicate marketplace conditions in which the respondents would encounter the products. *See* Tr. at 1002–04. It might have been impractical to recreate display cases and salespersons wearing each fragrance's colors. However, Conopco, in an effort to present the accused product in its proper marketplace context, should have, at the very least, presented to the participants, the various fragrance bottles with their respective boxes. *See* Tr. at 1003. The complete absence of the proper marketplace impression strikes another blow to the probative value of Conopco's first confusion survey. *See Cumberland Packing,* 32 F.Supp.2d at 575.

Despite bearing no burden to produce survey evidence, Cosmair, in an effort to address what it properly perceived to be the flaws of Conopco's confusion survey, conducted a pair of its own confusion surveys. The first of the two Cosmair surveys was designed to determine whether consumers would confuse the two products at issue, ETERNITY and ROMANCE. The second survey was designed to determine whether consumers would confuse the association, origin or affiliation of the ROMANCE product. The two surveys showed virtually no likelihood of confusion. *See* DX–BY, CJ.

In the first of Cosmair's two surveys, participants were shown an ETERNITY advertisement and were then asked to choose the product that appeared in the advertisement from an array. *See* Tr. at 986–1010. Less than one percent of the respondents identified ROMANCE as the product which they saw in the advertisement. *See* Defs.' Mem. at 14. In the second survey, participants were shown several advertisements for different products, one of which was ETERNITY. *See* Tr. at 1055–79; DX CJ. The advertisement shown utilized the ETERNITY icon bottle. *See* DX–CJ. Afterwards, the participants were shown the ROMANCE bottle. To test for confusion, participants were asked if the ROMANCE product had a connection to or association with Calvin Klein or ETERNITY. None of the responses showed confusion.

In an effort to disparage Cosmair's surveys, Conopco characterized them as "memory retention/ reading tests" that "say nothing about confusion in the marketplace." *See* Pls.' Mem. at 22. As such, Conopco believes the two surveys are not probative. *See id.* This Court acknowledges that "surveys which do nothing more than demonstrate the respondent's ability to read" are not always probative on the issue of likelihood of confusion. *See Franklin Resources Inc. v. Franklin Credit Mgt. Corp.,* 988 F.Supp. 322, 335 (S.D.N.Y.1997). In *Franklin,* however, the name "Franklin" itself was the trademark at issue. *See id.* at 326. Here, however, the source of alleged confusion is a bottle. In such situations when the source of the alleged confusion is not just a name, word or phrase, this Court believes surveys, like those conducted by Cosmair, are helpful and any shortcomings will sim-

---

18. To the extent that the Court discounts the value of the survey evidence for use of the pre-launch ROMANCE bottle as an improper stimulus, the Court's ultimate determination regarding the absence of consumer confusion, given the other flaws in the survey, would not change to the extent that the pre-launch bottle is deemed a proper stimulus.

19. Conopco's confusion survey, like its secondary meaning survey, failed to use a control bottle that faintly resembled the ETERNITY bottle. *See* PX–28. By failing to use a control that "could plausibly emanate from Calvin Klein," *see* Tr. at 429–30, the Court must further discount the strength of Conopco's confusion survey.

ply affect their probative value, not destroy it completely.

Finally, Conopco, critical of what it perceived to be flaws in Cosmair's surveys, prepared its own "modified" version of Cosmair's first confusion test. *See* Tr. at 863–72. In doing so, survey respondents were once again shown an ETERNITY advertisement, the same one used by Cosmair. Participants were then shown several products, none of which was ETERNITY. *See* PX–63. They were then asked to identify the product which was previously shown to them in the advertisement. ETERNITY was not one of the products shown to the participants, a flaw which this Court notes was designed to exacerbate confusion by encouraging participants to guess. *See* Tr. at 1011–14; *Cumberland Packing,* 32 F.Supp.2d at 575 (surveys flawed for not discouraging guessing). Nonetheless, only 7.2 percent of the respondents identified RALPH LAUREN ROMANCE as the product which appeared in the advertisement. *See* PX–63. After not achieving the results that he had expected, Conopco's expert, in an ex-post facto rationalization which he never tested, blamed the advertisement, calling it ineffective.[20] *See* Tr. at 1141–42.

In all, the survey evidence fails to persuade the Court that actual confusion in the marketplace between ROMANCE and ETERNITY exists. While Cosmair's surveys were helpful, they were in no way controlling. More important to the Court's analysis was the result of Conopco's first confusion survey. Despite employing a methodology blatantly designed to skew the survey's results in favor of confusion, the resulting confusion rate was only 24 percent. Such a confusion rate is relatively low for such a flawed survey. Therefore, even if the Court disregarded all of the survey evidence except for the first confusion survey conducted by Conopco, as Conopco has asked, this *Polaroid*

factor would still tip in favor of Cosmair because the quantitative result of Conopco's survey, when adjusted for all of its numerous methodological flaws, is devoid of significant consumer confusion.

*Quality of the Junior User's Product*

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener,* 59 F.3d at 398 (citing *Lois Sportswear,* 799 F.2d at 875). Here, Conopco neither alleges that ROMANCE is an inferior product, nor offered any "evidence at the hearing about the quality of Defendants' ROMANCE product line." Pls.' Mem. at 23. On the other hand, Cosmair presented testimony that ROMANCE is a relatively high-priced, high-quality prestige fragrance, that is sold in upscale department and speciality stores throughout the country. *See* Tr. at 535–39, 748–50, 758–59. In the absence of evidence, or even the allegation that ROMANCE is of inferior quality, *see W.W.W. Pharmaceutical Co.,* 984 F.2d at 575, and the presence of credible testimony regarding the good quality of the ROMANCE line, the Court finds that this factor favors Cosmair.

*Defendants' Good Faith*

This factor assesses whether the defendant "adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 583 (2d Cir.1991) (quoting *Edison Bros. Stores, Inc. v. Cosmair,* 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)). Either actual or constructive knowledge of the prior user's trademark or trade dress is probative of the junior user's intent. *See Mobil Oil,* 818 F.2d at 259. Moreover, a finding of intentional copying, although not generally relevant in a trade dress

---

**20.** The survey participants inability to identify the icon bottle in the ETERNITY advertisements further supports the Court's conclusion that the perfume bottle has weak secondary meaning with the consuming public.

infringement claim, "could support the inference" that the junior user "was acting with intent to create confusion with the senior user's product." *Fun–Damental Too*, 111 F.3d at 1004.

In the instant case, Conopco argues that Cosmair was put on notice that the ROMANCE bottle and proposed advertising campaign were "confusingly similar" to their ETERNITY bottle. *See* Pls.' Mem. at 18. Conopco cites several instances where people involved in the process of developing and launching the ROMANCE line expressed concern that the bottle and the bottle top were similar to and reminded them of the ETERNITY bottle.[21] *See id.* at 19. In addition, Conopco notes that some participants in a Cosmair sponsored focus group also stated that the ROMANCE bottle reminded them of the ETERNITY bottle. *See id.* Although aware of this, Conopco argues that Cosmair, without seeking the advice of counsel, went ahead anyway because of internal time-pressures to launch in September. *See id.* at 20. In response, Cosmair asserts that the evidence that a few survey participants were "reminded" of ETERNITY, is insufficient to prove that it is guilty of intentional copying or bad faith. *See* Defs.' Mem. at 16–17. Moreover, Cosmair explains that the "concerns" raised by its personnel is proof, not that they intentionally copied the ETERNITY trade dress, or proceeded to launch with reckless indifference, but rather that Cosmair wished to confirm that the ROMANCE bottle was "sufficiently distinct" from other competitors in the industry. *See id.* at 18.

While it is undisputed that Cosmair was aware of the ETERNITY bottle, and that some concern was expressed that the ROMANCE bottle was "similar to" or "reminiscent" of ETERNITY, Conopco does not allege that Cosmair intentionally copied its trade dress. *See* Pls' Mem. at 18–21. Rather, Conopco asks the Court to infer

bad faith from Cosmair's failure to seek advice of counsel and for allegedly remaining willfully blind in the face of the aforementioned warnings. *See id.* The Court declines to do so. First, the Court finds that the comments of a few participants in the focus groups that stated that ROMANCE reminded them of ETERNITY, when considered in the context of the several thousand received, *see* Tr. at 736–40, does not support the inference that Cosmair was willfully blind or indifferent to Conopco's interests. Second, the Court finds that Ms. Robinson's answers to the questions posed directly by the Court regarding the "concerns" raised at the personnel meetings credible and persuasive. *See* Tr. at 672–73. She explained that the meetings in question were designed to insure that "we had our own identity," and that their product was not similar to other competitors in the field. *See id.* Finally, the fact that the overall appearance of the ROMANCE trade dress is not similar to the ETERNITY trade dress further militates against a finding of bad faith. Therefore, Conopco has failed to establish bad faith.

### Sophistication of the Consumer

This factor examines the sophistication of the average consumer and the level of care they exercise when purchasing the products at issue. *See The Sports Authority, Inc.*, 89 F.3d at 965. The Court "must consider [t]he general impression of the ordinary purchaser, buying under the normally prevalent condition of the market and giving the attention such purchasers usually give in buying that class of goods." *W.W.W. Pharmaceutical*, 984 F.2d at 575. In the case at bar, Conopco argues that Cosmair's market research suggests that women between the ages of 18 and 54 who purchase fragrances are "impulse buyers—they buy now rather than wait," Pls.' Mem. at 23; Tr. at 1220–21, and *a fortiori* they are unsophisticated. The Court is

---

21. Ralph Lauren himself raised the issue that the ROMANCE bottle was too similar to the ETERNITY bottle at a product development meeting, and questioned whether the cap should be a different color. *See* Tr. at 951.

not persuaded by this argument. There is ample evidence in the record that the purchasers of expensive perfumes from high-end department and specialty stores, who are often assisted by retail selling specialists and beauty advisors, *see* Tr. at 268–70, 535–39, 571–72, 725–26, are sophisticated and discriminating consumers. *See id.* at 1006. Other Courts faced with this question have reached the same result. *See Edison Brothers Stores*, 651 F.Supp. at 1651–52 (holding that the purchasers of expensive perfumes "are likely to devote a high degree of care and attention to their selection"); *Nina Ricci, S.A.R.L. v. Gemcraft Ltd.*, 612 F.Supp. 1520, 1529 (S.D.N.Y.1985) ("Women who use expensive perfumes are sophisticated and discriminating consumers"); *P.F. Cosmetique, S.A. v. Minnetonka, Inc.*, 605 F.Supp. 662, 671 (S.D.N.Y.1985) (concluding that purchasers of top-of-the-line beauty products in roughly similar product packaging often distinguish between products that share a number of common elements). Therefore, the Court concludes that this factor supports Cosmair.

*Balancing the Factors*

■ Balancing all of the factors, and in light of the totality of the evidence, the Court finds that Conopco has failed to establish a likelihood of confusion. Given the Court's finding that Conopco's mark is relatively weak, the dissimilarity of the ROMANCE and ETERNITY marks, the prominent inclusion of the Ralph Lauren trademark on the ROMANCE bottle, box, and advertising, the absence of bad faith, along with the other factors, the Court is not persuaded that consumers will be confused into believing that ROMANCE is sponsored by or associated with ETERNITY. Thus, Conopco's motion for a preliminary injunction against the pre-launch and post-launch ROMANCE bottles based on

alleged infringement of its trademark and trade dress is denied. Furthermore, since Conopco has failed to establish likelihood of confusion, it cannot establish irreparable harm by the denial of the injunction. Therefore, the Court need not consider the issue of laches.

## II. DILUTION

■ Although neither party addressed this claim in its post-hearing brief or at oral argument, the Court will now address the issue of dilution under both federal and state law. Conopco alleges in its complaint that Cosmair's use of the ROMANCE perfume bottle will dilute the distinctive quality of the ETERNITY perfume bottle in violation of Section 43(c). *See* Compl. at ¶ 54–55. The Federal Trademark Dilution Act of 1995 [22] protects famous marks against persons who seek to trade on that fame and goodwill of the established mark and thereby dilute its image. *See Nabisco, Inc. v. PF Brands*, 50 F.Supp.2d 188, 200 (S.D.N.Y.1999). The Act defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence of absence of— (1) competition between the owner of the famous mark, and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. Dilution can occur in two forms, either by blurring or tarnishment. *See The Trustees of Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 749–50 (S.D.N.Y.1997). Dilution through blurring occurs when a party uses or modifies the plaintiff's mark thereby creating the possibility that the mark will lose the ability to serve as a unique identifier. *See id.* at 750. "Dilution through tarnishment oc-

---

**22.** Section 43(c) of the Lanham Act provides in pertinent part that:
(1) "The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another

person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c).

curs where the defendant uses the plaintiff's mark in association with unwholesome or shoddy goods or services." *Id.*

█ In order to prevail for a claim of dilution under the Act two elements must be shown: (1) ownership of a famous mark; and (2) a likelihood of dilution. *See Nabisco Brands,* at ——, 1999 WL 47313 at *10. The Act, in an effort to provide guidance to courts considering whether a mark is "famous" provides a non-exclusive list of eight factors. *See* 15 U.S.C. § 1125(c)(1). They include: (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark in connection with the goods; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the trading area in which the mark is used; (5) the channels of trade for the goods or services with which the mark is used; (6) the degree of recognition of the mark in trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (7) the nature and extent of the use of same or similar marks by third parties; and (8) whether the mark was registered under the Act as of March 3, 1881, or the Act of February 20, 1905, or on the principal register. *See id.* Finally, "the determination of whether a mark is famous or distinctive under Section 43(c) is similar to the analysis for strength of mark for trademark infringement purposes." *Trustees of Columbia University,* 964 F.Supp. at 749.

█ In the instant case, Conopco does not allege that the ROMANCE perfume line is of inferior quality, *see* Pls.' Mem. at 23, therefore the Court need only consider whether the ROMANCE mark is likely to dilute the strength of the ETERNITY perfume bottle through blurring. As already noted above, the Court is not con-

vinced that Conopco's mark, although inherently distinctive, is particularly strong in the perfume industry given its similarity to other bottles, nor has it acquired strong secondary meaning. The overall sales of the premium ETERNITY perfume, compared to the entire ETERNITY line, are quite small, and the advertising evidence presented by Conopco at the hearing was unpersuasive. More importantly, Conopco's own secondary meaning survey, without discounting for its serious methodological flaws, found a relatively low recognition rate of 21 percent. Moreover, the Court is not convinced that Conopco can establish a likelihood of dilution.[23] As previously discussed, the Court concludes that the ROMANCE and ETERNITY bottles, and related trade dresses, are dissimilar, the products are purchased by sophisticated and discriminating consumers, Conopco has failed to establish Cosmair's bad faith, or that the ETERNITY perfume bottle is a particularly strong mark. Accordingly, the Court is not convinced that the ETERNITY perfume bottle qualifies as a famous or distinctive mark within the meaning of Section 43(c) of the Lanham Act, or that the ROMANCE bottle or trade dress is likely to lessen the source-identifying nature of the ETERNITY mark. Therefore, Conopco's application for a preliminary injunction under this theory is also denied.

Conopco also alleges that the ROMANCE bottle will dilute the distinctiveness of the ETERNITY perfume bottle in violation of the New York anti-dilution statute. *See* Compl. at ¶ 57–58. The New York General Business Law provides that:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or in

---

**23.** A likelihood of dilution is determined by examining six factors: (1) similarity of the marks; (2) similarity of the products covered by the marks; (3) sophistication of the consumers; (4) predatory intent; (5) renown of

the senior user's mark; (6) renown of the junior user's mark. *See Mead Data Central, Inc. v. Toyota Motor Sales, Inc.,* 875 F.2d 1026, 1030 (2d Cir.1989)

cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

N.Y. Gen. Bus. Law § 368–d. To establish diliution, Conopco must show: (1) ownership of a famous distinctive mark; and (2) a likelihood of dilution. *See Hormel Foods Corp., v. Jim Henson Productions,* 73 F.3d 497, 506 (2d Cir.1996). For the reasons stated above, Conopco has failed to establish that its mark is distinctive or that the ROMANCE bottle is likely to cause dilution. Therefore, the Court also declines to issue a preliminary injunction on this claim.

## III. STATE UNFAIR COMPETITION

■■■■ Conopco alleges in its complaint that it is entitled to a preliminary injunction because Cosmair's bottle is likely to deceive the consuming public into falsely believing that ROMANCE originates or is sponsored by Conopco. *See* Compl. at ¶ 50, 65. "Under New York law, the essence of unfair competition ... is the bad faith misappropriation of the labors and expenditure of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Trustees of Columbia University,* at 750–751. As noted above, Conopco has failed to prove that Cosmair launched the ROMANCE bottle in bad faith, or establish a likelihood of confusion. Therefore, this claim must also fail.

## IV. ATTORNEY'S FEES

■■■■ Cosmair moves for an award of attorney's fees under both Fed.R.Civ.P. 11 ("Rule 11") and 28 U.S.C. § 1927 because Conopco continued to press their application for a preliminary injunction when surveys conducted after the close of the record confirmed Cosmair's position that Conopco could not establish consumer confusion between the ROMANCE and ETERNITY bottles. *See* Defs.' Mem. at 24. Rule 11 permits the imposition of sanctions "where it is patently clear that a claim has absolutely no chance of success under existing precedents, and where no reasonable argument can be advanced to extend, modify, or reverse the law as it stands ...." *Stern v. Leucadia Nat. Corp.,* 844 F.2d 997, 1005 (2d Cir.) (quoting *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir. 1985)), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). In considering an application under Rule 11, the Court must avoid hindsight and resolve all doubts in favor of the signer. *See Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir. 1986). Finally, a Court may only grant an award for attorney's fees under 28 U.S.C. § 1927 if it is "supported by a finding of bad faith." *Id.* at 1273.

■■■■ In the instant action Cosmair's argument, in a nutshell, is that Conopco should have withdrawn their motion for a preliminary injunction after its attempt to replicate Cosmair's confusion survey reported similar results—no confusion. The Court cannot agree with this position for two reasons. First, Conopco could have in good faith relied upon its first confusion survey (even though the Court ultimately rejected the strength of its results) as evidence of actual confusion; and (2) even assuming Cosmair's argument regarding the survey evidence is correct, Conopco's counsel could still have reasonably believed in the ultimate success of his motion since evidence of actual confusion is not required to prove a likelihood of confusion. *See McGregor–Doniger,* 599 F.2d at 59. Accordingly, Cosmair's application for attorney's fees shall be and hereby is denied.

## CONCLUSION

For the foregoing reasons, the Court denies Conopco's motion for a preliminary injunction and Cosmair's motion for an award of attorney's fees.

It is **SO ORDERED.**